### TEXAS & P. RY. CO. v. WILDER et al.

(Circuit Court of Appeals, Fifth Circuit. February 27, 1899.)

No. 722.

1. DEATH BY WRONGFUL ACT—ACTION BY PARENTS—MEASURE OF DAMAGES.

In an action by parents, under the statute of Texas, to recover for the death of their minor son, alleged to have been due to the negligence of defendant, it is proper for the jury, in assessing the damages, to consider what reasonable expectations the plaintiffs had of pecuniary benefits to be received by them from their son after he had reached his majority, as the statute provides for full pecuniary compensation to the parents for the loss of their son, and the damages are not restricted to the loss of benefits to which the plaintiffs had a legal right.

2. DEPOSITIONS TAKEN IN STATE COURT—USE IN FEDERAL COURT AFTER REMOVAL.

Depositions taken in a cause before its removal from a state court cannot be used on the trial in the federal court, where testimony taken in such court, under Rev. St. U. S. § 863, could not be read under the same circumstances, as where the witnesses are living within 100 miles of the place of trial and their oral testimony can be obtained.

Boarman, District Judge, dissenting, on the facts shown in this case.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

Joseph H. Wilder and his wife filed suit in the district court of Harrison county, Tex., against the Texas & Pacific Railway Co., for damages resulting

from the killing of their son, Frank G. Wilder. The son of the plaintiffs was in the employ of the defendant corporation as fireman on a switch engine. The plaintiffs alleged that, while their son was standing upon the apron that covers the space between the engine and tender, where they are joined together, and while he was performing his work as fireman, the apparatus which was used for coupling the engine and tender together gave way and broke, thus separating the engine from the tender, and. causing their son to suddenly fall between the engine and tender, upon the railway track, where he was crushed to death by the tender and several cars which were attached to the ·engine. The petition further alleged that Frank G. Wilder was 18 years and 5 months old at the time of his death; that he was the only son of the plaintiffs, and was earning, at the date of his death, $60 per month, all of which he contributed to plaintiffs for their support; that he was sober, healthy, robust, and industrious; that his capacity to earn money would have rapidly increased from the day of his death up to the age of 21 years, and that he would have earned, for the last two years of his minority, the sum of $150 per month, which he would have contributed to the support of plaintiffs, all of which earnings were relied upon by plaintiffs as a help for their support; that the capacity of Frank G. Wilder to earn money after majority would have increased to the sum of from $150 to $250 per month for a period of at least 30 years, and that he would have contributed that amount to their support as long as they and he lived; that the plaintiff Joseph H. Wilder is 52 years of age, and his wife is 46 years of age, and that they relied upon their son to contribute his earnings after he attained the age of 21 to help support them in their old age, when they should become unfitted to earn a livelihood; that the locomotive and tender were in bad repair, and unfit for the use to which they were being applied, in this: that the coupling apparatus was defective and out of repair, and that the safety chains were unfit for the use to which they were applied,—all of which was known to the defendant corporation, or could have been known to it by the exercise of ordinary care, and was unknown to Frank G. Wilder. Certain defects in the engine and the air brake were also averred. The defendant corporation applied to the state court for the removal of the cause to the federal court. The application was at first refused by the state court, but subsequently, and some months after the filing of the suit, the application for the removal was granted, and the cause was removed to the federal court. Before the determination by the state court of the application for the removal, the defendant corporation filed a general denial and answer in the state court. As special defenses, the defendant corporation pleaded that Frank G. Wilder knew, or could have known, of the defects in the engine and coupling, and therefore assumed the risk which might result from those defects; also that the plaintiffs consented to the employment of their son, and released all claim to his wages in consideration of his obtaining the employment; also that Frank G. Wilder was injured by the negligence of his fellow servant, the engineer on the switch engine, by the rough manner in which the engine was handled, and by the failure of the engineer to see that the engine was in good working order. The case was tried in the federal court, and resulted in a verdict of $3,000 against the defendant corporation, apportioned as follows: $2,000 for Mrs. Lurena Wilder, the mother of the decedent, and $1,000 for Joseph H. Wilder, the father.

There are four specifications of error. The first sets out that the court erred in permitting the depositions of three witnesses to be read in evidence. These were depositions which were taken in the state court before the removal. The second specification of error complains that the court, in substance, charged the jury that the plaintiffs could recover damages for the loss of prospective benefits to them after their son should have reached his majority. The third specification of error complains that the court refused, at the request of the defendant corporation, to give the following special charge: "In this case you cannot allow any damages for what Frank Wilder might have contributed to his parents after he became 21 years old; that would be too speculative and uncertain. You can only allow the present value of the amount Frank Wilder would have earned during his minority, after deducting the expenses of the support of said Frank Wilder during minority." The fourth specification of error addresses itself to the refusal of the court to give the following special charge: "In this case there is no

direct evidence as to whether the deceased, Frank Wilder, knew of the condition of the coupling between the engine and tender. Now, if you believe it was a part of said Wilder's duty to examine and inspect said engine, then, in the absence of other evidence, he would be presumed to know of the actual condition of said· engine and the coupling appliances."

T. J. Freeman and F. H. Prendergast, for plaintiff in error.

W. C. Lane and W. H. Pope, for defendant in error.

Before McCORMICK, Circuit Judge, and BOARMAN and PARLANGE, District Judges.

PARLANGE, District Judge, after stating the case, delivered the opinion of the court.

There is no merit in the second and third specifications of error, which are founded upon the false assumption that the damages in the cause were restricted to the benefits which the plaintiffs might have derived from the services of their son up to the time of his majority. We are clearly of opinion that the damages should not have been so restricted, and that in this cause it was proper for the trial judge to charge the jury that, in assessing the damages, they had a right to consider what reasonable expectations the plaintiffs had of pecuniary benefits to be received by them from their son after he should have reached the age of majority. The statutes of the state of Texas which give a right of action in cases like the one at bar provide, among other matters, that a suit may be brought for actual damages on account of injuries causing the death of any person by the negligence or carelessness of the owner of any railroad, or of any person in charge or control of any railroad, or of their servants or agents. The right of action is also given "when the death of any person is caused by the wrongful act, negligence, unskillfulness, or default of another." The action is declared by the statutes to be for the sole and exclusive benefit of the surviving husband, wife, children, and parents of the decedent. The statutes provide, further, that, in the actions just stated, "the jury may give such damages as they may think proportioned to the injury resulting from such death." Rev. St. arts. 2899, 2909. There is nothing in the statutes just referred to which limits the right of the parents in the present cause to the recovery of compensation for the services of their son during his minority. On the contrary, those statutes, as applied to the present cause, provide for full pecuniary compensation to the parents for the loss of their son. This is shown both by the language conferring the right of action and by the power given the jury in assessing the damages.

It has often been held, in similar cases, that the damages are not restricted to the loss of benefits to which the plaintiff had a legal right. It is plain that the compensation to the parents, under the statutes, would not be adequate if it was limited to the loss of the minor's services up to the time of his majority. If the objection be that it is difficult to ascertain the amount of the damages caused by loss of benefits after majority, it should be noted that this objection might also be made, although perhaps with less force, to the damages for loss of service before majority. There can be no certainty that a child will live to majority and perform services for his parents. If he

lives, he may sicken, and become a burden to his parents. Still, it is not contended, as to damages up to a child's majority, that the difficulty in ascertaining them is a sufficient ground for rejecting a claim for them. It is evident that there is much difficulty in assessing damages resulting from loss of life, and that strict accuracy cannot be expected in a matter involving so much uncertainty. Yet the right of recovery for injuries resulting from death being plainly given, the courts, availing themselves of all the circumstances which may assist them in reaching a proper conclusion, must, whenever possible, afford the relief which the lawmaker intends to give.

The counsel for the plaintiff in error state in their brief that there is a conflict of authority on the point which we are now examining. It is plain to us that a number of cases which seem to hold in opposition to our views in this matter were founded upon statutes which restricted the right of recovery. In 3 Suth. Dam. §§ 1273, 1274, it is said that:

"In several states, the damages for the death of a child have been limited to the pecuniary benefits the parents had a legal right to claim for the child's services, and therefore the courts have confined the estimate to the period of minority. This restriction is believed to be contrary to the general principle on which pecuniary damages are allowed in favor of all classes who are next of kin to the deceased. That principle is that the jury should calculate the damages, in reference to the reasonable expectation of benefits as of right or otherwise, from the continuance of the life. Legal ability alone is not the test of the injury in respect of which damages may be recovered under the statutes, but the reasonable expectation of pecuniary advantage by the relative remaining alive may be taken into account. * * * Statutes which give the right to recover for the benefit of the next of kin permit the parents to recover for the death of adult children, on the principle just stated. Why, therefore, when a minor is killed, should the estimate of damages stop arbitrarily at majority?"

In some jurisdictions, the parent has, by statute, an action against the child for support. But, apart from any such statute, there certainly is an indisputable natural obligation on the part of the child to support his necessitous parents. The plain dictate of nature requires a child, grown up to manhood, to relieve the wants of his destitute parents, and the obligation is one which men ordinarily fulfill. Why, then, should parents who have been deprived of their child by the fault of another be debarred from compensation for the full benefits which they reasonably expected from the child? In Railway Co. v. Compton, 75 Tex. 667, 13 S. W. 667; and in Railway Co. v. Sciacca, 80 Tex. 350, 16 S. W. 31, it was said that the parents' right of recovery is not limited to the services of the child up to majority. In the case at bar the son was over 18 years of age. He was strong, healthy, sober, and hard-working. He was dutiful, and evinced his willingness to assist his parents by freely giving his earnings to his mother. It was plainly proper in this cause for the trial judge to instruct the jury that they could consider whether the parents had a reasonable expectation that their son would continue to assist them after his majority.

The fourth specification of error, which complains of the refusal of the trial court to give a special charge, is without force. The trial judge, in his general charge, instructed the jury "that if deceased knew of the condition of the engine, or by the use of ordinary care could have

known it, plaintiffs cannot recover." This was sufficient on the matter which is the subject of the special charge refused.

We find that the error complained of by the first specification of error is well founded, and compels the reversal of the judgment of the lower court. While this cause was pending in the state court, the depositions of certain witnesses were taken under the practice of the state of Texas. When these depositions were offered in evidence on the trial in the federal court, they were objected to on the ground that the witnesses were accessible, and resided within 100 miles of the place where this cause was tried, and that there was no proof of facts permitting the depositions to be read. We have carefully examined the point, and have reached the conclusion that the depositions should have been rejected. The court admitted them on the ground that they were taken and returned into court while the case was pending in the state court, and before its removal. Act March 3, 1875, § 4, provides that, upon the removal of a cause from a state court, "all injunctions, orders and other proceedings had in such court prior to its removal, shall remain in full force and effect until dissolved or modified by the court to which such suit shall be removed." We understand that it is upon this statute that the court based its action in admitting the depositions. To sustain the admission of the depositions, the counsel for the defendants in error cite, in addition to the act of March 3, 1875, the act of March 9, 1892, entitled "An act to provide an additional mode of taking depositions of witnesses in causes pending in the courts of the United States." It is evident that neither statute had the effect of making the depositions admissible, under the circumstances of this cause. There are but two cases cited by the counsel for the defendants in error in support of the admissibility of the depositions, viz.: Fogg v. Fisk, 19 Fed. 235, and Davis v. Railway Co., 25 Fed. 786. In Fogg v. Fisk, Judge Wallace held that an order to examine the defendant in the state court, made prior to the removal, was an "order or proceeding" which was removed to the federal court with the cause, under the act of 1875, and that the order should be carried out in the federal court. But the supreme court reversed Judge Wallace. 113 U. S. 713, 5 Sup. Ct. 724. In Davis v. Railway Co., just cited, Judge (now Justice) Brewer did not deal with the question of depositions. The point involved was whether a demurrer which was overruled in the state court prior to the removal should still be considered as overruled after the removal. Judge Brewer very correctly held that the overruling of the demurrer was an order or proceeding which, under the act of 1875, was removed with the cause. It is thus seen that the only two cases cited to support the admission of the depositions in this case do not in fact sustain the contention of the counsel who cited them. In Ex parte Fisk, 113 U. S. 713, 5 Sup. Ct. 724, already cited, and in Railway Co. v. Botsford, 141 U. S. 256, 11 Sup. Ct. 1000, the supreme court made it clear that in the federal courts, regardless of state practice or statutes, the testimony must be oral. When a deposition is taken de bene esse, under Rev. St. U. S. § 863, it is not final, and, under the express terms of Id. § 865, it cannot be read on the trial, unless "it appears to the satisfaction of the

court that the witness is then dead or gone out of the United States or to a greater distance than 100 miles from the place where the court is sitting, or that by reason of age, sickness, bodily infirmity or imprisonment, he is unable to travel and appear at court." See Insurance Co. v. Southgate, 5 Pet. 604; Harris v. Wall, 7 How. 693. In Shellabarger v. Oliver, 64 Fed. 306, it was held that the act of March 9, 1892, does not allow depositions taken under the state law to be read in the federal court unless they could be read under Rev. St. U. S. § 865. In Seeley v. Kansas City Star Co., 71 Fed. 555, Judge Phillips said that he knew of no instance in which the deposition taken in the state court was allowed to be read in the federal court. In Register Co. v. Leland, 77 Fed. 242, it was held that the act of March 9, 1892, only applies to the mode of taking depositions, and not to the use to which they are to be put. In Despeaux v. Railroad Co., 81 Fed. 897, Judge Dallas said that the act of March 9, 1892, applies only to the mode of taking depositions. He quoted, with approval, Shellabarger v. Oliver and Register Co. v. Leland, supra, and said that it would be unfortunate if the act of March 9, 1892, had been differently construed. In Whitford v. Clark Co., 119 U. S. 522, 7 Sup. Ct. 308, the supreme court reversed the case because depositions taken de bene esse, under Rev. St. U. S. § 863, had been admitted, though the witnesses were present and able to testify orally. It is plain that depositions taken under the federal statute cannot be read, if at the trial the witnesses can be obtained. It is not to be presumed that congress intended that depositions taken in the mode prescribed by the state law should be read in evidence, even though at the trial the witness could be had, and yet that testimony taken under Rev. St. U. S. § 863, could not be read under the same circumstances. It is plain to us that no such discrimination against the federal statute was intended by congress, and that the act of March 9, 1892, refers only, as appears from its plain reading, to the mode and manner of taking testimony, and not to its effect after it is taken, nor to the conditions under which it may be read. The bulk, if not the entirety, of the evidence of the plaintiffs below is contained in the depositions, and we are constrained to remand the cause. It is therefore ordered that the judgment of the lower court be reversed, and this cause is remanded to that court, with the instruction to grant a new trial.

BOARMAN, District Judge (dissenting). I concur in the order reversing the judgment of the lower court. I express no opinion on the ruling of the court as to the admissibility of the depositions discussed in this opinion. I do not concur in the opinion expressed by the court on the refusal of the circuit court to give the charge requested by the plaintiff in error, which charge is numbered 4, and is as follows:

"In this case you cannot allow any damages for what Frank Wilder might have contributed to his parents after he became 21 years old. That would be too speculative and uncertain. You can only allow the present value of the amount Frank Wilder would have earned during his minority, after deducting the expenses for the support of said Frank Wilder during minority."

As the evidence on the estimate of damages is short, and given by only two witnesses, the father and another, I quote all of it:

"That was our only son. He was eighteen years old at the time he met his death. His habits were good, as far as I know. He lived with us, and had always lived with us. I don't know whether I had occasion to observe his habits, as I was away every day and home at nights, and he worked a great deal of the time at nights,—most of the time. I have understood that his wages at the time of his death were $1.85 a day, as fireman on a switch engine. He used to give his money to his mother. I don't think he dissipated any. I don't know of his doing it at all. He was industrious and willing to work. His health was very good. He had been sick a month or two before this accident perhaps. His general health and physical constitution were very good. He was as intelligent as most any boy you could find. At the time of his death he had been working for the Texas & Pacific, the last time about a year. He had worked for them once before that, and he quit or was discharged, I don't know which. At the time he met his death he was firing the switch engine. After a man has been firing a road engine, the natural promotion is from a locomotive fireman to an engineer. I am a locomotive engineer, and have been in that business about 27 years. I have worked for the Texas & Pacific Railway Co. nearly 21 years. When a fireman finishes his work as a fireman, the next step is to be an engineer. The position of engineer pays more wages than that of a fireman; the engineer gets over one-third more than a fireman. The average wages of a locomotive fireman on the road will average about $75 a month, passenger and freight, taking the two. A fireman generally starts in his occupation as a switch-engine fireman, and works on up. My son used to be at home nights pretty regularly, and on Sundays he would not work, but used to go to church with his sisters, and he did not seem to have any bad habits that I know of. At the time he was killed he was working two weeks on duty at night, and two weeks on in the daytime. He lived at home, and gave his money to his mother. When he wanted clothing he used to go to his mother, and she would give him the money. She handled his earnings. He went to his mother for money, and if she thought he needed it she gave it to him. My occupation kept me away in the daytime. His mother handled his money for him; I did not do it. He was 18 years and 5 months old at the time of his death. The last time my son went to work for the company in Texarkana I think he worked about a year. He was in Bonham I think for two months. I don't think he had a regular engine all the time, but at the time of his death was regular fireman on the switch engine. I don't know how long he had been at that particular place. I don't know whether he worked at the roundhouse in Texarkana during the twelve months before his death. Each switch engine has a regular fireman, just as they have on the road. My wages as engineer ran over $155 per month."

"I had known Frank Wilder since he had been in Texarkana,—ever since he was a child, you might say. I believe he was the best boy I ever knew in my life. I have got two boys, and I think he was a better boy than mine. His habits were good; as good as they could be."

Having in view the evidence "in this case," I think that charge should have been given by the circuit judge. The plaintiffs ground their cause of action on article 2899, Rev. St. Tex. Under that article they are authorized to sue, and, on sufficient allegations and evidence, they may recover actual damages on account of injuries causing the deceased son's death. It will be seen that the purpose of the charge refused by the lower court was to forbid the jury to allow actual damages estimated on the probable earnings of the son, and the probable amount thereof which, after his majority, he would have contributed to the support of his parents. The plaintiff in error seems to concede that, under the Texas law, the parents have a legal right, at their will, to become the beneficiaries of the son's

earnings during the period of his minority. In the court's opinion, it will be seen that it is conceded that the parents have no legal right to any benefits from the son's earnings after his minority ceased. It follows, from the reasoning of the court, in which the concession suggested is apparent, that, the parents' legal right to such a benefit having ceased with the minority of the deceased son, their cause of action, in a case like this, can be to recover damages only for the loss of a moral expectancy which they had in the life of the son after his minority, to the effect that the deceased son, had he not been killed by the negligence of the railroad company, would have, with reasonable certainty, in response to the natural or moral obligation inhering in a son's filial duty, contributed his earnings, voluntarily, from time to time, to the support of his parents. On such a cause of action the court is of the opinion that the law of Texas, as well as the jurisprudence of the courts of the several states of the Union, authorizes an allowance for compensatory damages for the parents' loss of such an expectancy; that the value of such a lost expectancy may be commuted into such a cash sum as a jury might conclude from the evidence, which can at best be only speculative, to be adequately compensatory. Of course, this sum would have to be based on the jury's knowledge, if any such knowledge may be had from the evidence, which in the nature of things can be, at best, only speculative as to probabilities or eventualities of the future. Among such probabilities, inhering in the material issues of fact, the jury would have to consider the probability as to when, and in what degree, the parents would be, if ever or at all, in necessitous circumstances, so that Frank G., had he lived to be an adult, would have, in response to natural obligations to support his parents, contributed to the relief of their necessities; the probable length of their lives; the probable health, habits, and earning capacity of the son, and the probable length, too, of the son's life; the probabilities of the son remaining free from obligations which, in social ethics, would impose on him natural obligations superior to the demands of plaintiffs. All of such probabilities would have to be commuted into some degree of certainty, from the evidence, before anything like a just conclusion, as to the amount of compensatory damages, could be reached by the jury. Conditions such as are shown to be in esse in the petition, and in the limited evidence on behalf of the plaintiffs, as to the future, could not enable, even the speculative mind of a jury, "to look into the seeds of time, and say which grain will grow and which will not." Much less would such conditions as are established by the evidence enable a jury to make even a reasonable conjecture as to what the boy who was killed, had he lived on to the time of the necessitous circumstances of the parents, would have done in the discharge of such a natural obligation.

I think the authorities of the Texas courts cited, as well as all the others I have been able to examine, fail to support the views of the court in refusing the charge requested "in this case." Under the views laid down in the authorities I have examined, I think the limited evidence offered in this case, to illustrate the several probabilities herein mentioned, fails to show to a judicial mind a prepon-

derance one way or the other on the probabilities suggested herein, as inhering in the material issues of fact. And this failure, I think, suggests readily that the jury, in their speculative inquiry, should have been limited "in this case" to the purpose set forth in the charge. But, admitting the liberal view held by the court is well founded on the jurisprudence of the several courts of the Union, it follows only therefrom that there may be given cases in which the pleadings and evidence would authorize a jury, on the matter of allowing damages to parents of a deceased son after minority, estimated on the amount and value of the earnings which a dutiful son, in response to such natural obligations as inheres in filial and parental relations, would, after his minority, when the parents are shown to be in necessitous circumstances, because of old age or other infirmities, voluntarily contribute to their support. Into such a field of speculation a jury would not go with authorization of the court, unless in a case where the court was moved to allow such an inquiry by competent allegations in plaintiff's petition, and by material illustrative evidence thereon.

Recurring to the charge refused, it is well established in practice that a charge should not always be refused, even though it may state a rule not abstractly sound, or state a general rule which is sound, but not free in all cases from exceptions; because the charge requested may state a rule which is well founded in law, when applied to a stated or pending case. Just now it is not necessary to contend that the rule sought to be laid down by the attorney for the railroad company, to limit the time for the allowance of damages to the minority of the son, is a sound rule, either abstractly or generally, though I think the rule is founded in sound reasoning, and should apply, on the trial of all suits, when the result in favor of the plaintiffs can be reached only by a jury finding damages on such prospective eventualities as are discussed in the opinion of the court. I suggest, further, that when a court finds it necessary, in a state of case, from the very nature of the matters involved, to deal with speculations into, and eventualities of, the future, and the forum has the "coign of vantage," or point d'apui, only for the most favored judicial inquiry from which to look into and measure probabilities, and resolve doubts into reasonable or practicable certainties, it might often be profitable, in the interest of just conclusions, to apply a rule like the one refused.

Keeping in line with the views of the counsel for the plaintiff in error, it will be seen that he does not contend that there may not be a case stated in which the parents can recover damages for the death of their adult son. His contention is that, when a minor is killed, the parents are deprived of his services from the date of his death until he becomes 21 years of age; that they are not entitled as of right, or as a matter of course, to his services or earnings after he becomes of age; that a recovery, not being, when the negligence and death are shown, a matter of course, would depend on the evidence illustrating the present conditions of his parents, those of the son, and their respective probable conditions and relations inter sese in the future. On or from such illustrative evidence, applying the

every-day experience of men familiar with human things, a jury, with some degree of certainty, might say that a dutiful adult son would respond to such an obligation in a beneficial way to necessitous parents. It is in the line of our experience that some sons do contribute to the support of necessitous parents, after they become of age, and in a speculative way we might say that some of the sons who are killed by negligence of railway companies would have so contributed after they became of age; but nothing further along this line, on the evidence in this case, can be projected with any degree of certainty from the every-day experience of men.

The counsel contends that it is not that the law forbids a recovery in such cases, but the obstacle in the way of recovery is the impossibility of proving such damages; and adds "that there is no way by which we can read the future, or give the jury a just standard on which to fix the amount. Before recovery can be had, the loss must be proved like any other fact. There can be no possible proof as to what the minor would have done with his earnings after he became of age. However dutiful a son he may have been, and however readily he may have allowed his parents to be the beneficiaries of his earnings during his minority, there is nothing in the proof to show, in a legal way, what he would have done with his earnings when he became his own man." The moral promise which may have been trustfully expressed, daily, in the son's dutiful and generous actions towards his parents during his minority, might not have been more binding on him to support his necessitous parents, after he became an adult, than a promise made in authentic form during his minority would have legally bound him after his majority. During his minority he might have, by domestic conditions or parental authority, been coerced to comply with the moral obligation. Even though he had made a promise in authentic form to continue on after his minority, in dutiful response to such influences, the law would not have compelled him to comply with such an obligation. Nor would he have in any way been amenable to the law if, when his minority ceased, he had refused to contribute anything to the support of his parents, however necessitous they may have been.

The question as to whether the parents can recover damages in such a case as this, beyond the period of the son's minority, must depend upon our view of the general law. It seems that in England, as well as in many of the states of the Union, there are statutes very similar in object and import. Counsel, in support of the charge requested, cites a number of authorities founded on the jurisprudence of the several states. In Harris, Dam. Corp. § 339, it is said:

"In an action for damages for the death of a minor, the rule would seem to be the probable value of his services from the date of the injury to the time he reaches his majority, less the probable costs of supporting him during that period." Railroad Co. v. Delaney, 82 Ill. 198.

To the same effect is Field, Dam. § 640; 3 Lawson, Rights, Rem. & Prac. § 1022; 5 Am. & Eng. Enc. Law, pp. 45, 46.

In State v. Baltimore & O. R. Co., 24 Md. 106, the court said:

"According to appellant's theory, the mother and son are supposed to live on together to an indefinite age,—one craving sympathy and support; the other rendering reverence, obedience, and protection. Such pictures of filial piety are inestimable moral examples, beautiful to contemplate, but the law

has no standard by which to measure the loss." Sedg. Meas. Dam. p. 697, and note; Patt. Ry. Acc. Law, § 204.

He supplements these authorities by a quotation at length, as follows, from Potter v. Railroad Co., 21 Wis. 379. In that suit, which was for the killing of a minor daughter, the court says:

"It was for the jury to determine what was the extent, under the proof in this case, of such reasonable expectation. The verdict must, however, be based upon evidence. The statute is peculiar, and much must be left to the sound judgment and discretion of the jury. We do not think it was intended they should find a verdict for damages without evidence of pecuniary loss. What is the testimony as to such loss to the parents in this case? It is that the deceased was aged 11 years and 3 months; that she was a bright, intelligent girl, strong and healthy; had been to school and Sunday school; was a good child to work, and accustomed to help her mother. This is all; and it is sufficient on which to base a verdict for any reasonable sum for loss of services of the deceased during her minority. But we are unable to see anything in the evidence proving, or tending to prove, a reasonable expectation of pecuniary benefit to the parents from the continuance of the life of their daughter beyond her minority. If it had been proved that the pecuniary circumstances and health of the parents were such as to render it probable they might need the services of the deceased, or aid from her, after she was 21 years of age, a foundation would have been laid for damages other than those resulting from the loss of her services during her minority. On the other hand, if the proof had shown that the parents were wealthy, there would have ordinarily been, it appears to us, no reasonable expectation to them of pecuniary benefit from the continuance of the life of the deceased beyond her minority. It is clear that the estate and condition of the parents might have much to do with the question of damages. So far as we have examined in suits like this, for the benefit of the parents, where damages have been recovered, other than the value of the services of the deceased during minority, there has been testimony showing the condition of such parents or tending to prove it. * * * Is there any reasonable expectation of pecuniary benefit to wealthy parents, or even those in moderate circumstances, between the extremes of poverty and wealth, from their children after they arrive at their majority? In the natural course of events, the children of such parents receive far more pecuniary aid or benefit from their parents than the parents from them. It appears to us, unless the condition of the parents is in evidence, the damages should be limited to the services during minority."

Applying these authorities, it will be seen that the petition in this pending case is fatally deficient in not showing that the parents would, at a time proximately stated, be entitled, because of their necessitous circumstances, from old age or other causes, to demand from the son, Frank G., a fulfillment of the natural obligation inhering in his filial relations to them. The petition does not, as it should, allege the degree, value, or extent of the natural obligation, nor does it show what time, in the nature of things, this natural obligation would begin to run in favor of the parents. These suggestions as to the petition will appear better founded if it is remembered that the court recognizes that the natural obligation would be only a nominal one; such a one as might, in good conscience, be discharged by dutifully observing the sacred injunction to "honor thy father and mother," unless the parents should become, by old age or other infirmities, dependent on the son for support. Then, I suggest, though the parents were in necessitous circumstances, the extent of the son's natural obligation might depend much, if not entirely, on whether or not the son was free from parental obligations of his own which might, in social ethics, be held to be a stronger demand on his support than the demand of even a necessitous father and mother. In

this case it may be, so far as the plaintiffs' allegations show, or evidence, that the parents were, and would probably remain for some years, abundantly able to earn a satisfactory living, as they were when the son was killed. The father then was earning $155 a month, and the mother still not an old woman. This discussion of the deficiency of the petition I confess would become gratuitous, in the face of the suggestion that the defendant company went to trial without making any objections to the insufficiency of the petition to show a cause of action. But my purpose, in referring to the deficiency in the petition, is to call attention to the fact that no evidence was administered by the plaintiffs to show such essential facts as would authorize a jury to go into the inquiry as to such probabilities, speculations, and eventualities (some of which I have referred to) upon which the reasonable estimate would have to be made as to the sum which would be adequately compensatory to the parent for the loss of such an expectancy. It follows, I think, that the charge which sought in its effect to limit the findings to the pleadings and evidence should have, "in this case," been given to the jury.

The law, in a given case, may give the plaintiff a cause of action to recover for such a lost expectancy, on sufficient evidence. The plaintiffs are seeking relief in a judicial forum. Such relief as they may be entitled to must be measured by the law and by well-established rules of practice, and the recovery must rest upon substantial evidence, showing the value, nature, extent, and demand for and on which plaintiffs seek relief. If the legal right ceased when the dutiful son would become an adult, there is no judicial authority, I think, which can safely award damages in any amount for the loss of an expectancy inhering in such a natural obligation, which, under the plaintiffs' pleadings, and the strongest and most illustrative evidence, must, in the nature and vicissitudes of human things, remain a speculative and variable quantity. I am of the opinion, under the pleadings and evidence "in this case," there was nothing in the evidence upon which the jury could, with any degree of accuracy, estimate the damage, if there was any pecuniary loss incurred by plaintiffs in the loss of such an expectancy.

Considering the meager, vague character of the evidence which seems to be relied on to illustrate and vindicate the plaintiffs' claim for damages, estimated on the probable gratuitous benefactions which the adult son would, out of his own earnings, have in response to continuing filial duty bestowed on the parents, it occurs to me that the effect of the court's opinion in this case will be substantially to make the defendant railway company assume towards the parents of its employés the assuring relations of a guaranty company, and to compel it by operation of law, and much as a matter of course, to do for and pay to such parents, by way of gracious indemnity, favors and benefactions of much pecuniary value, which they could not, so far as we are advised by the evidence, have expected from the most dutiful sons in response to a moral obligation.

The evidence, I think, fails to show anything, by way of suggestion or fact, by or from which the jury could have been advised, in a reasonable way, in their purpose to allow damages in any sum, estimated on the gratuities of the son to his parents after he should have be-

come his own man. It follows from this view that, as to allowing damages beyond the son's minority, the court below should have directed a verdict for the defendant. It occurs to me, further, that a judicial or just weighing or estimate of the speculative evidence, showing the strength of probabilities upon which the jury based their finding, would show that the plaintiffs will, in the enjoyment of the sum of money into which these probabilities and eventualities have been commuted by the jury, be much better off than they would have been had the "mother and son lived on together, to an indefinite age, one craving sympathy and support, the other rendering obedience and protection."