the owner thereof. There was error in rejecting this testimony. The case will be remanded.

Plaintiff, Mrs. Shield, has appealed from the judgment dismissing her suit against the New Orleans Railway & Light Company, and she asks for a reversal of the same. The evidence as to the fault or negligence of the Railway Company is conflicting; but, after examining and weighing same, we are of the opinion that there was no concurrent fault or negligence on the part of that Company. The evidence shows that the motorneer of the car which collided with the taxicab was efficient and watchful; that the car was in good order; that it was being operated at the usual rate of speed, and not contrary to the city ordinances; and that the motorneer did everything that could be expected of a reasonable person under the circumstances to prevent the accident.

Several witnesses examined on behalf of plaintiff, as well as those examined on behalf of the Railway Company, show that the accident was unavoidable in so far as the Railway Company is concerned, and that everything possible was done by the motorneer to avoid the collision. There can be no recovery by the plaintiff against the Railway Company under these circumstances.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed.

It is now ordered that the exception of no cause of action be sustained to that portion of plaintiff's claim for expenses incurred for doctors, medicine, nurses, clothing, and ambulance service.

It is further ordered, adjudged, and decreed that this case be remanded to the trial court to be there tried in accordance with law and with the views herein expressed as to the defendant F. Johnson & Son Company, Limited, costs to await the final determination of the cause.

It is further ordered, adjudged, and decreed that the judgment in favor of defendant the New Orleans Railway & Light Company be affirmed, with costs in both courts.

## On Application for Rehearing.

PER CURIAM. The judgment herein is amended so as make the costs of appeal on the appeal of F. Johnson & Son Company, Limited, payable by Mrs. Adele B. Shield, appellee.

---

(61 South. 790.)

No. 18,916.

FUCHS et al. v. KANSAS CITY SOUTHERN RY. CO.

(May 6, 1912. On Rehearing, April 29, 1913.)

*(Syllabus by the Court.)*

1. MASTER AND SERVANT (§ 153*)—DEATH (§ 31*) — INJURY TO SERVANT — FAILURE TO WARN—DAMAGES RECOVERABLE.

Where a boy, who has served but one-half of the term of his apprenticeship as a boiler maker, is assigned a journeyman's job, with inadequate instructions as to the danger which may attend its execution, and for lack of such instruction and of any knowledge or experience of his own loses his life, his employer is liable to his surviving brothers and sisters (in default of wife or children or parents) for what he might have recovered, had he lived, for his suffering up to the moment of his death, and, upon their own account, for the loss of such present and future assistance as they might reasonably have expected, as, also, for the loss of the society of their nearest and dearest relative, where it appears that the decedent was the head of the family which he aided in keeping together and maintaining.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 314–317; Dec. Dig. § 153;* Death, Cent. Dig. §§ 35, 37–46, 48; Dec. Dig. § 31.*]

2. MASTER AND SERVANT (§ 153*)—SUFFICIENCY OF WARNING.

A general admonition to a boiler maker's apprentice that he should be careful about going with a lighted lamp or torch into the empty tank of an oil tank car may convey warning of danger from explosion of gas where such an explosion has come within the apprentice's observation or experience, but it does not necessarily do so when, for aught that appears, the apprentice had never heard of such an explosion, and only small blazes, resulting from the igni-

tion of oil and turpentine, had ever come within the range of his observation. It is not every one who knows the temperatures at which different oils are converted into gas, or the conditions under which different gases will explode.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 314–317; Dec. Dig. § 153.*]

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Action by Lena Fuchs and others against the Kansas City Southern Railway Company. From judgment for plaintiffs, defendant appeals, and plaintiffs, answering, pray that the award appealed from be increased. Modified and affirmed.

Alexander & Wilkinson, of Shreveport, for appellant. Blanchard, Barret & Smith and Williamson & Crain, all of Shreveport, for appellees.

## Statement of the Case.

MONROE, J. John Fuchs, a boiler maker's apprentice, about 19 years old, in defendant's employ, was instructed by his foreman to make some repairs upon an oil tank on wheels, or tank car, said tank being about 40 feet long, by 6 or 7 feet in diameter, with a dome, through which there was a manhole on the top of it midway between the two ends. He entered the tank through the manhole, in the discharge of the duty to which he was thus assigned, and carried an "open lamp" or "torch" with him; the result being that there was an explosion, followed by intense heat, whereby he received injuries from which he died in about an hour. Plaintiffs herein are his two grown unmarried sisters, and his two minor sisters and minor brother, who, having sued for damages, obtained judgment for $2,500, from which defendant prosecutes this appeal. Plaintiffs answer the appeal, and pray that the amount of the award be increased. The Kansas City Southern Railway Company is joined with the titular defendant, as its "holding company," and their defense is contributory negligence and assumption of risk on the part of the decedent.

The facts, as we find them from the evidence, are that the decedent was the oldest male member of his family; that he and his brothers and sisters lived together, their parents being dead; that they owned the house in which they lived; that one sister was training, in a hospital, to become a nurse, and the others, one aged 17, another 15, and the third, age not given, were at home, and that the decedent and a brother aged 17 were at work, contributing to the support of the family, the amount contributed by decedent being about $20 a month. Whether they owned any other property save the house in which they lived does not definitely appear, but it is shown that after the death of their brother two of the sisters, including the one who was in training as, and became, a nurse, went to work. At the time of his death decedent had been working in defendant's employ, as boiler maker's apprentice between eighteen months and two years, and on the morning of the accident was ordered by his foreman, Fowler, to make such repairs as were needed upon the tank in question. He informed Peyton, another apprentice, who was then about 15 years old, of the order that he had received, and Peyton accompanied him to the place called the "cinder pit" where the tank car was standing upon a spur track, and plaintiff entered the tank through the manhole in the dome carrying with him an open oil lamp, which was furnished by defendant for such use, it being necessary for him to go into the tank, because the place where the work of repair was to be done was on the inside, near, or at the end of the tank, and it was necessary for him to carry a light because otherwise he would have been unable to see. Peyton had walked less than a car length away when an explosion took place within the car, and Fuchs was heard to call out:

"For God's sake, somebody help me out!" the fact being that, having dropped into the tank through the dome, it would have been difficult, if not impossible, for him to have gotten out without assistance, even if he had not been injured. As it was, men came to assist him, but found the air coming out of the manhole so heated as to prevent their going in. They finally succeeded, however, in bringing out the body of the by that time unconscious youth by means of hooks; and found that his clothing had been blown to pieces, and that, though he still had some pulse, his flesh was in such condition that, when they attempted to resuscitate by rubbing him, it came off in their hands, and he died within an hour, without recovering consciousness. We do not find that the decedent had ever been warned of the danger from possible explosion of entering an empty oil tank with an open light, or that the danger from that source was necessarily so apparent that he should be presumed to have known it. The testimony of his foreman upon that subject, as in other respects, if not purposely evasive, is unresponsive to the questions propounded, vague and unsatisfactory, and other testimony adduced by defendants in that behalf fails to cover the point. Thus the testimony of Fowler, the foreman, runs, in part, as follows:

"Q. He had been there nearly two years at the time of his death? A. I do not think hardly that long; about a year and a half or two years. Q. What instructions, if any, were given him with reference to going into these tank cars with a light? A. Well, I instructed them all to be careful. We had had several occurrences of that kind, previous to that, in tanks. * * * Q. Had he at any time since he entered the service of the company, under your supervision, been by you or any one in authority instructed as to how to tell whether it was safe or unsafe to go down in that car with a light? A. Yes, sir; time and time again, for the simple reason he had seen from experience time and again several instances that it was dangerous. * * * Q. Did you ever—can you tell me whether you ever gave specific instruction about going into those tank cars before discovering or knowing that all the gas was out?

A. Yes, sir; I have instructed all of the boys; I cannot say what certain tank, because I knew this, that I was the only one to learn them, and the further they got towards their trade, the better for me."

On cross-examination:

"Q. You have said that there had been several somewhat similar explosions, and he, Fuchs, was present; I want to ask you— A. I did not say explosions; I said oil caught fire in the tank. Q. Can you give any of the details? A. Well, there was one tank that had turpentine in it. Q. Was Fuchs working on the inside of that tank? A. No, sir; on the outside, heating rivets. Q. What was the nature of that ignition—you did not regard it as an explosion? A. No, sir. Q. And what occurred then—Fuchs was on the outside when that occurred? A. Yes, sir; it just started a small blaze. Q. Can you recall another? A. Yes, sir; some tank in the roundhouse, I think tank No. 488. Q. What was the nature of that explosion? A. The same thing—just a small blaze there. Q. The oil caught fire? A. Yes, sir—was painting. Q. Now, can you recall a third explosion, similar; the paint one time and oil twice? A. Paint one time and oil twice. Q. Those are the ones that you recall? A. Yes, sir. Q. * * * What experience did you have about those tank cars, as to their being dangerous when open; did you ever open one and ignite the gas and an explosion followed? A. Not on the Kansas City Southern; I have on the Southern Pacific; I know of several instances where it occurred by taking off the cap. Q. And having a light about the opening? Yes, sir."

Baxter, an apprentice, testifies, in part, as follows:

"Q. You remember whether he [Fowler] said anything about being careful not to go about the oil tank cars, or said anything with reference to the gas? A. Not to go in them. Q. You recall whether or not Mr. Fowler told him of the danger of the gas that was generated from the oil in the cars; if so, state what he said? A. He told him to be careful about going in them. Q. He just said, in a general way, to be careful about going in those cars, or what other warning was it? A. He said: 'Now, John, you want to be careful about going in those oil tanks.' Q. What else did he say; is that all you recall? A. Yes, sir. Q. Did you ever see any similar explosions? A. That is the only one I ever saw. Q. Only one you ever heard of? A. I never heard of any around there."

J. G. Nicholson, a machinist, who was in the employ of defendant when he testified, had been so employed for 14 years (less two

years), and assisted in getting the body of Fuchs out of the tank, testified as follows:

"Q. Were you ever given any instructions about going into these cars and the danger from explosion? A. No, sir; but I am a great hand to read the papers and ascertain the different happenings, and I have read of where explosions occurred from switchmen putting a lighted lantern in the dome to see if the tank was empty. Q. Then your information was derived from the newspapers? A. Yes, sir. Q. Not from the company? A. No, sir. * * * Q. Do you know whether or not prior to this explosion there were any rules posted to warn the employés about going into the oil tanks or oil tank cars? A. If there were I did not see them. * * * Q. After that car [referring to any oil tank car] was emptied of the oil and it was discovered that it needed a patch, or a new valve, what was the process adopted to relieve that car of the dangerous gases? A. I never paid very much attention to it at that time, but the process used now I suppose is just about the same as at that time. They would open the discharge valve, first open the dome, and there is a cap rod from there to the valve in the bottom. Usually there is a lot of mud that comes from the crude oil; sometimes it gets about a foot deep, and they wash that out with water; that runs the mud out; then they close the valve and put a hose in there and turn the steam in there and steam it an hour or so, or two or three hours, and the steam heats the sides of the car, and that relieves the oil, and it passes through the valve, and that makes it clean enough for commercial use. * * * Q. Then the explosion that you heard that day and the result of the explosion would not have occurred on a car that was thus provided for his entrance? A. I am under the impression—it don't stand to reason that it would. It has been proven since, when a car is washed out, an open light is not dangerous. I do not know what amount of gas would be inflammable."

Peyton, the boy who accompanied the decedent to the tank, examined under commission, on behalf of plaintiffs, gives the following, with other testimony:

"The car mentioned was placed on the cinder pit for repair. It had been customary until just a short time before that for the cars to be washed out before the repairs were made, with the exception that sometimes the tanks needed only the leaks to be stopped up, and sometimes the car men had to work on them. Just a short time before that a new man had been placed there on that part of the work, and he had never washed them out, * * * I saw him (Fuchs) enter the car, and he had to go in and put on a new valve seat. * * *

Cross-interrogatory 16:

"If, in answer to interrogatory 14, * * * you state that you have seen some of the employés go into oil tank cars with a light similar to the one that Fuchs had on the day of his death, state, if you know, what precaution they took to ascertain whether the oil or gas was all out of the car or not? Is it not a fact that, if you let the gas escape from one of those cars, there is no danger in going into it with a light? A. I don't guess they were scared by that because they were always washed out before that. They didn't take any precautions like that that I know of. If the gas was all out, there wouldn't be any danger of an explosion."

From other testimony we infer that some cars needing repairs were sent to the roundhouse, and that in such cases they were steamed and washed out in the manner described by Nicholson before the repairs were attempted. Other cars, also needing repairs, were placed on a spur track at the cinder pit where steam was not available, and, if washed out at all, were washed only with cold water; the helper of the boiler maker who was sent to make the repairs (if it was that kind of work that was needed) being expected to do the washing when so instructed by the boiler maker. It further appears that Fuchs (who was not a boiler maker, but an apprentice, having more than two years of his time to serve) was given a journeyman's job, and that a helper named Peterson was assigned to him, but whether Peterson had given the tank in question the cold water washing above referred to does not appear. The tank had, however, been standing out in the sun in August with the two openings (the cap, on the dome, and the valve, near the bottom) closed, so that, whatever oil may have remained in it, supposing it to have been washed with cold water, had in all probability been converted into gas, and that oil would remain after such washing we conclude from the fact that it was considered necessary to use both steam and cold water to make such cars clean enough for commercial use.

Golitely, a witness for defendant, testifies that he heard Fowler tell Fuchs "to always be careful and see that the tanks were washed out before going into them," and further, in part, as follows:

"Well, you see, who does the job, he always washes it out before going in them. * * * The boiler maker's helper washes out the tank themselves. * * * Q. Who was doing that washing for Fuchs? A. Simon Peterson was Fuchs' helper at that time. Q. Where was Simon that day? A. Simon was with him at the time; as far as washing out the tank, I do not know about that. Q. Where is Simon now? A. He is out there. Q. He is here? A. Yes, sir. * * * Q. Who was the foreman when Fuchs was there—Mr. Fowler? A. Yes, sir. Q. He would tell him what work to do? A. Yes, sir. Q. He would tell these boys, here is the car to work on, here is the place to repair it? A. Yes, sir. Q. He would always find out whether they were washed out or not? A. Yes, sir. Q. Then he would tell them, after finding out it was all right, to go there and do the fixing? A. He would tell them to do the job on the tank—to look in and see if any oil was in it—always wash it out—then go to work and do the job—do what was necessary. Q. Then, he would tell these boys to go and repair it? A. Yes, sir. Q. So, when Fuchs was there with his light, torch, and all the tools to repair it, when he would go to repair it, he would not fool about washing it out? A. No, sir; Fowler done saw that it was washed out himself. Q. Had been doing it? A. Yes, sir; of course, I do not know anything about this car."

We quote the following additional testimony from Fowler:

"Q. Now they, after they [referring to Fuchs and some other boys, Simon or Peyton, perhaps] had repaired the other cars and got down to this one, you told them, here was the car, to go ahead and fix it, car No. 7538, or else they would not have done anything to that car? A. I showed them the car. Q. You said, 'Here is this car, fix it'? A. Yes, sir. Q. Now, you go ahead and repair it? A. Yes, sir. Q. How long was that before the explosion? A. I do not remember; * * * I had more than one job; I had many jobs to look after. Q. You remember in looking after your duties that you took these boys to this car, and said, 'Here, repair this car; that patch is what is leaking; now repair it'—now, how long was that before this explosion? A. I may have told them that the day before. I might have told them that 15 or 20 minutes before. I had seen them there 15 or 20 minutes before. Q. Whenever it was, you did not go to the manhole yourself, did not go to see whether the cap was removed, or how long it had been removed; you said to them, 'Here is the place, go to work'? A. Yes, sir. * * * Q. Is it not a fact that you stated in your direct examination that some of the cars were put there after they had already been flushed? A. No, sir; I said that, sometimes, the car repairers flushed them. Q. You did not investigate this one to see whether they had done so or not? A. No, sir; the fellow on the job was to look after that."

## Opinion.

[2] Whatever, then, may be said in regard to what Fuchs should be presumed to have known, it appears affirmatively, as we think from the evidence in the record, that the extent of the warning that he received as to oil tanks was that he should be careful about going into them, and should see that they had been or were washed out before he did so. He was not told that there was any danger to be apprehended from an explosion of gas, no such explosion had ever occurred at defendants' shops where he was employed and where no other danger in that connection had come within his observation than two or three small blazes resulting from the ignition of turpentine and oil, and it does not appear that he had ever heard of the explosion of gas in a tank at any other place. We deduce from the testimony that tank cars were sometimes placed on the cinder pit track, in order that the tanks themselves should be repaired by the boiler makers after they had been washed by the car repairers, and were sometimes placed there before they had been washed by the car repairers, in which latter cases, the boiler makers would see to the washing themselves—with cold water, as they had no steam at their command. Whether the car repairers in washing the tanks always used steam does not appear. As to the particular car in question, there is no direct testimony that it had not been washed before Fuchs entered it, nor is there any testimony that it had been washed. There is some testimony to the effect that

after a cold water washing a tank may be entered with safety, and that the cold water takes out all the oil and all the gas, and we have no doubt that the witnesses testified truthfully, so far as they knew. It may be, and we see no reason to doubt, that it would be safe to enter a tank immediately after it has been filled with cold water and emptied, but we think the witnesses speak in ignorance when they say that all the oil is then removed, else, why are all of those which go to the roundhouse subjected to a steam bath in addition with the effect, as the most intelligent witness in the case puts it, that "the steam heats the sides of the car" (meaning tank), and that relieves the oil, and it passes "through the valve and that makes it clean enough for commercial use."

Whether the tank in question had been washed out was information that was in the possession of the defendants, for Peterson, Fuchs' helper, is shown by the testimony of their witness, Golitely, to have been present at the trial of the case. He was not, however, called to the stand. If we assume that the tank had been flushed, or washed out, with cold water, we are of opinion that there may nevertheless have been left in it oil sufficient, when converted into gas, to account for the explosion, and the conversion into gas may readily be accounted for by the fact that the iron tank containing such oil had been standing with all the apertures closed, exposed possibly for several days to the rays of an August sun. If we assume that the tank had not been washed, so far as the record informs us, the danger concerning which Fuchs is shown to have had the opportunity to learn something, from observation, was that by entering the tank with an open lamp, he might set fire to the remaining oil. It does not appear, however, that he was ever told why it would be dangerous to enter an unwashed car with a torch, and though it may be said that the danger of setting fire to the oil was obvious, and that he must have appreciated it, there is no reason to suppose that he did not or that he allowed, or would have allowed, his torch to come in contact with what little oil may have been left in the tank. The danger of gas explosion on the other hand, though it would, no doubt, have been obvious to many persons, would not have been obvious to many others, since it is not every one who knows the temperature or conditions under which oils of different kinds are converted into gas, and it may reasonably be presumed that it was not obvious to Fuchs, for that would be to assume that he knew that the moment he entered the tank with his torch he would meet a most agonizing death. Some of the witnesses say that the presence of gas in the tank should have been discoverable upon the opening of the cap of the dome, and we have no doubt there was an odor there. We take it, however, that any odor coming from a closed vessel containing, or which has contained, coal oil, is the oil converted into gas; but it does not follow that, because there is enough of such gas to be perceptible to the sense of smell, there is enough to produce an explosion, and it is not every one who knows how much is required for that purpose. In any event it would seem that there was not enough at the opening in the dome of the tank; for, if there had been, the explosion would have taken place there, and Fuchs would have gone no farther. There is a good deal said in the brief of counsel about the testimony of Peyton, because it differs from a statement taken from him by the claim agent of the defendants, immediately after the accident, and because the judge a quo declined to admit the statement in evidence. It appears that Peyton had moved to Kansas City, and that plaintiffs' counsel, after a vain attempt to get him to come to

Shreveport and testify orally, took his testimony by commission, and offered it in evidence, after which defendants' counsel, who had succeeded in getting him to come, called him to the stand for cross-examination, and then offered the statement to contradict the testimony elicited from him. We think the statement was inadmissible, but it is in the transcript, and, comparing it with the testimony, we think the latter controls and that the credibility of the witness is not seriously affected by the conflict between them. It is a very difficult thing for any one person to so express in writing as to meet with the entire approval of another their real understanding upon any given question; and, whilst we attribute no unfair dealing to the claim agent, we attach but little importance to the fact that after he had written down what he understood to be the boy's version, not only of the accident itself, but of some other things of interest to the defendants, the boy, who was a boiler maker's apprentice, about 15 years old, should have read and signed it without insisting upon corrections. It may be that it was not legibly written, and the boy did not like to admit that he could not read it; or that, amid unfamiliar surroundings and in the presence of those in authority, he was too much embarrassed to take in what he read or to protest that in some particulars it was not what he intended to say. At all events, we have both his statement and his testimony and we find the latter straightforward and, as we think, truthful. But, even if that were not the case, and we should accept the statement and reject the testimony, our conclusions upon the case here presented would be the same.

[1] There is also a good deal said about the bearing upon the case of the act of Congress known as the "Employer's Liability Act," approved April 22, 1908, as amended by the act approved April 5, 1910 (Act April 22, 1908, c. 149, 35 Stat. 65, as amended by Act April 5, 1910, c. 143, 36 Stat. 291 [U. S. Comp. St. Supp. 1911, p. 1324]); but we are of opinion that that act need not be considered at all; for the case here presented is one where a boy, who had served only one-half of the term of his apprenticeship, was assigned a journeyman's job, with inadequate instructions as to the danger which might attend its execution, and for lack of such instructions and of any knowledge or experience of his own he lost his life. Without considering, therefore, whether the defendants should not before that sacrifice have done what they did afterwards (i. e., provide electric lights for workmen in tank cars and inspectors to see that the cars are safe), the law of Louisiana is broad enough to entitle plaintiffs to recover. The amount allowed by our learned Brother of the district court we think is inadequate. John Fuchs lived long enough to suffer horribly, and plaintiffs are entitled to recover for that suffering what he might have been entitled to recover had he survived. He was the head of the little family of brothers and sisters, living at home, and, with his younger brother, keeping the family together, and assisting in maintaining the other members until they should be able to maintain themselves. Those other members were thus receiving some material aid from him, and might reasonably have looked to him for greater assistance in the future, and they are entitled to recover for the loss of that prospect. Finally, they have lost their nearest and dearest relative, who lived with them and whose life was identified with theirs, and they are entitled to something in the nature of compensation for that loss. Upon the whole we think the award should be increased to $5,000.

It is therefore ordered, adjudged, and decreed that the amount of the judgment appealed from be increased to $5,000, and, as

thus amended, that said judgment be affirmed, all costs to be paid by defendants.

The CHIEF JUSTICE concurs in the decree.

## On Rehearing.

PROVOSTY, J. The testimony of a witness taken out of the state because of the fact of his residing out of the state is inadmissible if at the time of the trial the witness is present in court, and subject to be called as a witness. Hawkins v. Brown, 3 Rob. 310; 13 Cyc. 988; Wigmore on Ev. § 1415; Davison v. Sherburne, 57 Minn. 355, 59 N. W. 316, 47 Am. St. Rep. 618; 9 A. & E. E. of L. 352; Whitford v. County of Clark, 119 U. S. 522, 7 Sup. Ct. 306, 30 L. Ed. 500; Texas & Pacific Ry. Co. v. Wilder, 92 Fed. 958, 35 C. C. A. 105; U. S. v. Julian, 162 U. S. 325, 16 Sup. Ct. 801, 40 L. Ed. 985. The testimony of the witness Peyton should therefore have been excluded. But the exclusion of the evidence in chief of this witness carries with it the statement made out of court by the same witness which was admissible only in impeachment; and after a careful re-examination of the case we have reached the same conclusion that, eliminating this witness altogether, the facts of the case show that Fuchs was not given the proper warning as to the danger of explosions from gas before being sent to do upon this tank work which necessarily required him to go into it with the open light that was then provided by the defendant company for that purpose. The foreman himself, Fowler, although a witness evidently well disposed to the defendant, will not say that he gave him this instruction; and it was necessary instruction, since the danger which he was sent to encounter was that particular one, and since it was one of which the employer should have had knowledge.

On the question of the quantum of the damages we have found no reason for changing our opinion.

The judgment heretofore handed down is therefore reinstated, and made the final judgment of this court.